**EXHIBIT A**

2023 WL 8018980
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

MAYOR AND CITY COUNCIL OF BALTIMORE, on behalf of itself and all others similarly situated, Plaintiff,
v.
MERCK SHARP & DOHME CORP., Defendant.

CIVIL ACTION No. 23-828
|
Signed November 20, 2023

**Attorneys and Law Firms**

Daniel H. Silverman, Cohen Milstein Sellers & Toll PLLC, Chicago, IL, David Langer, Eric L. Cramer, Russell D. Paul, Berger Montague PC, Philadelphia, PA, Gary L. Azorsky, Cohen Milstein Sellers & Toll PLLC, Philadelphia, PA, Leonardo Chingcuanco, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Daniel J. Walker, Berger Montague PC, Washington, DC, Marc H. Edelson, Edelson Lechtzin LLP, Newtown, PA, Sharon K. Robertson, Cohen Milstein Sellers Toll PLLC, New York, NY, for Plaintiff.

Andrew D. Lazerow, Ashley E. Bass, Covington & Burling LLP, Washington, DC, Lisa Dykstra, Philadelpha, PA, Mark J. Fanelli, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

McHUGH, United States District Judge

 **\*1**  This is an antitrust class action alleging that Defendant Merck Sharp & Dohme Corporation ("Merck") has engaged in illegal conduct that forecloses competition in a significant portion of the rotavirus vaccine market. Plaintiff is a third-party payor ("TPP") that paid for all or part of the purchase price of vaccines, including Defendant Merck's vaccine RotaTeq, on behalf of members and beneficiaries of its self-funded health insurance plan. Plaintiff alleges that Merck used its monopoly in other vaccine markets to stifle competition in the rotavirus vaccine market by imposing loyalty conditions in vaccine contracts that threatened customers with higher prices for all Merck vaccines in a designated bundle, including the monopoly vaccines, unless they purchased all or nearly all their rotavirus vaccines from Merck. This allegedly foreclosed competition in much of the rotavirus vaccine market and kept prices at artificially inflated levels even after the introduction of a competing rotavirus vaccine by GlaxoSmithKline ("GSK").

Plaintiff brings this putative class action on behalf of all similarly injured TPPs to challenge Merck's conduct and its alleged impact on competition and prices in the rotavirus vaccine market. It seeks injunctive relief under the Sherman Act, as well as all available relief under an array of state antitrust and consumer protection statutes. Merck moves to dismiss the Complaint in its entirety for failure to state a claim, arguing that (1) the bundling of its vaccine products does not support a cognizable claim under the Sherman Act because Plaintiff fails to plead sufficient details as to how it was injured and how Merck's conduct harmed competition; (2) Plaintiff fails to allege how Merck's actions substantially foreclosed competitor access to the relevant market; (3) Plaintiff cannot seek injunctive relief because it did not plead it lacks an adequate remedy at law; (4) Plaintiff lacks standing to assert many of the state law claims; (5) Plaintiff's state law claims are supported only by conclusory allegations; and (6) many of Plaintiff's state law claims fail to satisfy unique elements of each respective state's antitrust or consumer law. For the reasons below, I disagree with most of Merck's arguments, but will dismiss Plaintiff's Idaho and Utah consumer law claims.

**I. Factual Allegations**

**A. Allegations as to Pediatric Vaccine Markets & Merck's Monopoly in Several Vaccine Markets**

Vaccine sales are a large and expanding pharmaceutical product market. Compl. ¶ 35 (ECF 1). Between 2005 and 2015, global vaccine sales revenue quadrupled from approximately $10 billion to approximately $41 billion. *Id.* Generally, vaccines are separated into two market segments: adult and pediatric. *Id.* Over the past several decades, vaccine production in the United States has become increasingly concentrated. *Id.* ¶ 36. Twenty-six different companies held vaccine licenses in the United States in 1967, but that number dropped to twelve by 2002. *Id.*

Today, four companies sell multiple pediatric vaccines in the United States: Pfizer Inc. ("Pfizer") sells two, Merck and Sanofi Pasteur Inc. ("Sanofi") each sell nine, and GSK sells ten. *Id.* ¶¶ 23, 38. Merck and Sanofi have complementary vaccine lines with minimal overlap, and together sell products in twelve different vaccine markets. *Id.* ¶ 38. GSK competes

with Merck in five of these markets, including vaccines for rotavirus, hepatitis A, hepatitis B, *haemophilus influenzae* type b ("Hib"), and (starting in June 2022) measles, mumps, rubella (MMR). *Id.* GSK also competes with Sanofi in six vaccine markets. *Id.* For much of the relevant period, however, Merck was the sole supplier in three of the markets in which it produced a vaccine that was used in pediatric care: the MMR, varicella, and HPV vaccine markets. *Id.* ¶¶ 38, 57, 65, 74. [1] Merck allegedly also had market or monopoly power in the rotavirus, hepatitis A, and hepatitis B vaccine markets for part of the relevant period. *Id.* ¶ 113.

**\*2** The vaccines produced by Pfizer, Merck, Sanofi, and GSK (along with Novartis, which produces a single vaccine for meningitis) are summarized below: [2]

|  | **Merck** | **Sanofi** | **GSK** | **Novartis** | **Pfizer** |
|---|---|---|---|---|---|
| **DTap** |  | Daptacel<br>Quadracel*<br>Pentacel*<br>Vaxelis* | Infanrix<br>Kinrix*<br>Pediarix* |  |  |
| **Tdap** |  | Adacel | Boostrix |  |  |
| **Polio** |  | IPOL<br>Pentacel*<br>Vaxelis* | Kinrix*<br>Pediarix* |  |  |
| **Pneumococcal** | Pneumovax |  |  |  | Prevnar |
| **Hib** | PedvaxHIB | ActHIB<br>Pentacel*<br>Vaxelis* | Hiberix |  |  |
| **Rotavirus** | RotaTeq |  | Rotarix |  |  |
| **MMR** | MMRII<br>ProQuad* |  | PRIORIX[3] |  |  |
| **Varicella** | Varivax<br>ProQuad* |  |  |  |  |
| **Hepatitis A** | Vaqta |  | Havrix<br>Twinrix*[4] |  |  |
| **Hepatitis B** | Recombivax | Vaxelis | Engerix B<br>Twinrix<br>Pediarix |  |  |
| **Meningitis** |  | Menactra<br>Menomune | Bexsero | Menveo | Trumenba |
| **HPV** | Gardasil |  |  |  |  |

Each year the U.S. Centers for Disease Control and Prevention ("CDC") Advisory Committee on Immunization Practices ("ACIP") publishes schedules of recommended immunizations for pediatric patients. *Id.* ¶ 22. The ACIP schedule currently includes all the above-listed vaccines, along with the COVID-19 vaccine and influenza vaccine. *Id.* ¶ 23. Pediatric care providers generally must purchase each type of vaccine included on the ACIP schedule. *Id.* ¶ 146.

**B. Allegations as to the Rotavirus Vaccine Market**
In February 2006, the FDA licensed RotaTeq, a rotavirus vaccine marketed by Merck, for sale in the United States.

Compl. ¶ 42. RotaTeq is administered in a three-dose series, with doses administered at ages two, four, and six months. *Id.* Merck was the only seller of a rotavirus vaccine in the United States until 2008, when GSK introduced Rotarix. *Id.* ¶¶ 3-4, 47. GSK's Rotarix is administered in a two-dose series, with doses administered at ages two and four months. *Id.* ¶ 43. According to the complaint, the two vaccines are similar, and neither the ACIP nor the Academies of Pediatrics or Family Physicians state a preference for RotaTeq or Rotarix. *Id.* ¶¶ 33, 45. As with other pediatric vaccines, ACIP guidelines dictate that providers should complete a patient's vaccination schedule using the same brand of vaccine for each dose. *Id.* ¶ 146. Moreover, as with many vaccines, there is no reasonably available substitute for rotavirus vaccines, as a vaccine for one disease is not interchangeable for another. *Id.* ¶¶ 16, 46.

Prior to 2008, Merck had a complete monopoly in the rotavirus vaccine market. *Id.* ¶ 47. After Rotarix's introduction in April 2008, Merck's market share dropped somewhat, though remains high. *Id.* In 2016, Merck's rotavirus vaccine market share was 73%, and by 2022 that share had risen to 80%. *Id.*

### C. Allegations as to the Impact of the Merck Bundle on the Rotavirus Vaccine Market

Most private pediatric health care providers purchase their vaccines through physician buying groups ("PBGs") or group purchasing organizations ("GPOs"), which negotiate vaccine purchasing contracts with pharmaceutical companies. *Id.* ¶¶ 120-22. Many of Merck's agreements with PBGs and other GPOs have historically contained "loyalty" provisions that conditioned vaccine price discounts upon PBG or GPO members purchasing an array of Merck vaccines only from Merck and penalized members if they purchased competing vaccines from other manufacturers by charging higher prices. *Id.* ¶¶ 4, 121-22.

 *3  Prior to GSK's launch of Rotarix in 2008, Merck altered its existing purchasing contracts to include one such loyalty provision in purchasing contracts that involved RotaTeq. *Id.* ¶¶ 115-18. The new condition – which Plaintiff refers to as the "RotaTeq Bundled Loyalty Condition" and the "Merck Bundle" – covered the vast majority of rotavirus vaccine purchases in the United States and required customers to buy all or nearly all of their rotavirus vaccines from Merck or face significant price penalties on *all* of their Merck vaccine purchases. *Id.* ¶¶ 4, 118. Because of this new provision, any existing RotaTeq customer who wished to switch some or all their purchases to GSK's Rotarix would be faced with a significant price increase on RotaTeq, as well as *all* of the vaccines in the Merck Bundle – including those for which Merck was the sole supplier. *Id.* These price increases varied significantly, ranging from 2% to nearly 58% of the purchase price. *Id.* ¶ 118. In addition to ensuring loyalty to Merck by threatening higher prices, PBGs themselves often assisted Merck in ensuring that their members purchased nearly all of their rotavirus vaccines from Merck, as Merck also paid PBGs rebates and fees that were contingent upon PBG members' compliance with the bundled loyalty condition. *See id.* ¶¶ 121-23, 138-41.

As purchasers could no longer switch to a competitor rotavirus vaccine without being subject to price penalties for an array of vaccines, including several for which Merck was the sole supplier, Plaintiff alleges that the rotavirus market was essentially split into two segments – purchasers loyal to the Merck Bundle, and "disloyal" purchasers who purchased some amount of Rotarix and were subjected to increased costs across all of Merck's vaccine bundle. *Id.* ¶¶ 5-6. This ultimately impacted GSK's behavior in the market, impairing its ability to compete with Merck for the loyal purchasers, and forcing it to target only Merck's disloyal purchasers. *Id.* ¶¶ 6, 144-46. Overall, Plaintiff alleges that the cumulative impact of the new bundled loyalty condition was that competition was likely foreclosed in at least 40% of the rotavirus vaccine market, as a competitor like GSK had no rational incentive to go after the percent of the market comprised of RotaTeq purchasers locked into the Merck Bundle. *See id.* ¶¶ 5, 116, 142-49.

Since Rotarix was introduced by GSK, Merck has maintained or raised the price of RotaTeq every year.[5] *Id.* ¶ 161. Plaintiff alleges that these list prices and the lower prices charged to loyal purchasers were *both* artificially inflated monopoly prices and reflect Merck's insulation from competition through the Merck Bundle and its associated loyalty provisions. *See id.* ¶¶ 150-161. Because the Merck Bundle allegedly decreases GSK's incentive to compete for any purchasers except for the disloyal buyers, who were subject to the disloyal "penalty" price for RotaTeq, Plaintiff alleges that the Merck Bundle also artificially inflated Rotarix prices. *Id.* ¶ 157. These higher prices paid by purchasers were then passed on to patients, as well as TPPs – such as Plaintiff and members of the putative class – who reimburse their members when they receive a rotavirus vaccine. *Id.* ¶¶ 1, 7-8, 26.

## II. Standard of Review

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

### III. Discussion

#### A. Plaintiff pleads an antitrust injury.

To bring claims under Sections 1 and 2 of the Sherman Act, a plaintiff must allege "that the defendant engaged in anticompetitive conduct and that the plaintiff suffered antitrust injury." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012). [6] Merck argues that Plaintiff does not allege either, but for the reasons below I disagree.

*1. Plaintiff pleads harm to competition.*

**\*4** Merck first alleges that Plaintiff fails to plead any harm to competition, because the factual allegations suggest that Merck's chief competitor in the pediatric vaccine market, GSK, could have competed against Merck but simply chose not to. Mot. Dismiss 9-12 (ECF 25). Plaintiff responds that this argument misrepresents the Complaint, which alleges that Merck's bundled discounts both blocked GSK from competing and diminished GSK's incentives to compete. Pl.'s Resp. to Mot. Dismiss 22-23 (ECF 27).

The Third Circuit has previously held that when a defendant forecloses competition to its product in a competitive market by linking sales of that product to a product for which it faces no competition, this may constitute harm to competition. *See LePage's Inc. v. 3M*, 324 F.3d 141, 155-56 (3d Cir. 2003), *cert. denied*, 542 U.S. 953 (2004). In *LePage's*, the defendant – 3M – manufactured Scotch tape, and had over 90% market share in the United States transparent tape market. *Id.* at 144. The plaintiff was an office product supplier who, among other products, sold private label transparent tape – i.e., tape sold under a store brand rather than under the name of a manufacturer. *Id.* After the private label tape market expanded in the 1990s, 3M engaged in an array of anticompetitive conduct to keep its monopoly in the transparent tape market, including signing exclusive dealing arrangements and instituting a multi-tiered "bundled rebate" structure, which offered higher rebates when customers purchased products across 3M's diverse product lines. *Id.* at 145. After a comprehensive review of antitrust precedent, the Third Circuit held that the bundled rebates offered by 3M had a significant anticompetitive effect because, when instituted by a monopolist, they risked foreclosing "portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *Id.* at 155. [7]

Merck argues that *LePage's* has been eroded or limited by later Third Circuit decisions. Mot. Dismiss 9. For several reasons, I view *LePage's* as retaining its vitality. It is axiomatic that one panel of the Court of Appeals cannot overrule another, and *LePage's* was an *en banc* opinion decided by a margin of 7 to 3, an opinion noteworthy for its depth of analysis. Furthermore, the specific language from the two cases that Merck cites as evidence of the Third Circuit limiting *LePage* – *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405 n.35 (3d Cir. 2016) and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275, n.11 (3d Cir. 2012) – appears in footnotes. And part of the commentary in *Eisai* acknowledged *LePage's* central holding that linking a product market with no competition to a product market with competition poses antitrust concerns. *See* 821 F. 3d at 405-06 (focusing on plaintiff's failure to plead that defendant "conditioned discounts on purchases across various product lines, but on different types of demand for the same product," which "does not present the same antitrust concerns as in *LePage's*"). *Meritor* further distinguished *LePage's*, emphasizing that the analogy between bundled rebates and unlawful tying only applies where "two separate product markets have been linked," and noting that *LePage's* is "inapplicable" where "only one product is at issue and the plaintiffs have not made any allegations of bundling or tying." 696 F.3d at 274 n.11.

**\*5** *Eisai* also recognized a point of agreement between *Meritor* and *LePage's*, in that both cases involved consumers who had choices in the marketplace, but "anticompetitive conduct rendered that choice meaningless." 821 F. 3d at 404. The Circuit declined to extend *LePage's* in *Eisai* "based on the facts presented" because the plaintiff did not show that "an equally efficient competitor was unable to compete." *Id.* at 406. As discussed below, a critical aspect of Plaintiff's theory in this case is Merck's market power with respect to other essential pediatric vaccines. *See* Compl. ¶¶152-59 (describing how bundling can lead

to anticompetitive effects). Despite Merck's contention otherwise, *see* Mot. Dismiss 14, the Circuit did not definitively reject the model advanced by the plaintiff's expert in *Eisai* that bundling different types of products could foreclose competition but instead found that the plaintiff did not "tie" its conceptual model to "concrete examples of anticompetitive consequences in the record." *Id. LePage's* critical holding – that bundled discounts offered by a monopolist may be anticompetitive when they "foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer" – remains viable. 324 F.3d at 155. [8]

Applying this rule, Plaintiff plausibly pleads harm to competition. Merck was allegedly the sole or dominant manufacturer for several vaccines that are considered essential to pediatric care for much of the relevant period, including the MMR, Varicella, and HPV vaccines. By including a loyalty condition in vaccine purchasing contracts that requires groups to purchase all or nearly all their rotavirus needs from Merck to receive steep discounts on Merck's other vaccines, Merck has "linked a product on which it faced competition with products on which it faced no competition." *LePage's*, 324 F.3d at 156 (citing *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978)). This type of conduct, which exploits Merck's dominant role in producing several indispensable vaccines, could certainly constitute a use of monopoly power that poses antitrust concerns. *See id.* (holding that 3M's conduct in bundling rebates for Scotch-brand tape with its other products was anticompetitive, because it exploited Scotch being "indispensable to any retailer in the transparent tape market"). As the Complaint alleges, even if GSK or another competitor wanted to expand its presence in the rotavirus vaccine market by offering a rotavirus vaccine at a lower price than RotaTeq, purchasing groups would have little incentive to purchase that alternative vaccine because doing so would expose them to the "penalty" prices for the other vaccines that they had no choice but to purchase from Merck. Compl. ¶¶ 144-48. Foreclosing a significant part of the market to a new entrant in this manner is squarely within the ambit of the Sherman Act. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (quoting *LePage's*, 324 F.3d at 159) (emphasizing that when a monopolist's actions "are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").

Merck asserts that even applying this rule, Plaintiff does not allege anticompetitive harm because the chief competitor here – GSK – manufactures an equally diverse group of products and therefore could offer a comparable bundle offer. Mot. Dismiss 4-5. In support of this view, Merck highlights Plaintiff's allegations that GSK sells ten pediatric vaccines (as opposed to Merck's nine) and points out that GSK could offer its own bundle that would contain four vaccines that Merck does *not* produce. *Id.* But as Plaintiff highlights in its opposition, the Complaint explicitly pleads that GSK could not have countered Merck's bundle with its own because Merck offered several *essential* vaccines – including MMR, varicella, and HPV vaccines – that GSK did not manufacture for much of the relevant period and therefore could not provide a replacement bundle. *See* Pl.'s Resp. 31 (citing Compl. ¶ 146). And although Merck rightly highlights that GSK produces a few vaccines that Merck does not produce, Sanofi also produces all these vaccines. Compl. ¶ 38. The Complaint sets forth that Merck's contracts allow purchasing groups to supplement their Merck purchases with purchases of Sanofi's "complementary" vaccine bundle – despite punishing them for purchasing vaccines from GSK in competitive markets. *See* Compl. ¶¶ 37, 97, 124. I am therefore convinced that Plaintiff has set forth sufficient allegations that GSK cannot offer a comparable bundle offer.

**\*6** Merck places emphasis on the general proposition that discounts – including bundled discounts – often benefit consumers and have minimal anticompetitive effect. Mot. Dismiss 10. Courts have often recognized that bundled discounts will not always run afoul of the antitrust laws and may play a normal part of competition in some circumstances. *See, e.g., It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684-87 (4th Cir. 2016) (emphasizing that "merely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive" and emphasizing the benefits to consumers of a package deal in a "free marketplace" with "robust market competition"); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895-56 (9th Cir. 2008) (recognizing that bundled discounts "generally benefit buyers" and that "price cutting is a practice the antitrust laws aim to promote"). But as the Third Circuit recognized in *LePage's*, other circuits have also acknowledged that such discounts *could* constitute anti-

competitive behavior that ultimately harms consumers in some circumstances. *See* *Cascade Health Sols.*, 515 F.3d at 896 (acknowledging that "it is possible, at least in theory, for a firm to use a bundled discount to exclude an equally or more efficient competitor and thereby reduce consumer welfare in the long run"). I therefore find that Plaintiff sufficiently pleads that Merck caused harm to competition.[9]

### 2. Plaintiff alleges a cognizable injury due to Merck's conduct.

Merck further asserts that Plaintiff fails to demonstrate that it suffered an antitrust *injury*, as required to plead its federal antitrust claims. Specifically, Merck argues that Plaintiff (1) fails to explain how it paid for Merck's vaccines, demonstrating some cognizable injury, and (2) does not establish that it paid higher prices for RotaTeq because of Merck's bundled discounts. Mot. Dismiss 13-14. Both arguments fall short.

#### a. Plaintiff sets forth sufficient facts describing how it paid for Merck's vaccines.

Merck first asserts that Plaintiff does nothing to explain how it paid for Merck's vaccines, beyond a "vague assertion" that it purchased, paid for, or reimbursed its members for "some or all" of the cost of RotaTeq, nor explains the alleged reimbursement mechanism. *See* Mot. Dismiss 13 (citing Compl. ¶ 26).

But the Complaint presents more than mere conclusory allegations. It identifies Baltimore as a "self-insured" entity and third-party payor who indirectly purchased, paid, and/or provided reimbursement for some or all of the healthcare costs – including the cost of rotavirus vaccines – of its members. Compl. ¶¶ 1, 8, 26. The Complaint goes on to explain that Merck sold rotavirus vaccines either directly to healthcare providers or to distributors, who then passed on the allegedly inflated prices of rotavirus vaccines to healthcare providers. *Id.* ¶¶ 25, 159. Providers then passed on those increased prices to patients and their insurers. *Id.* ¶ 159. Weaving these allegations together, the Complaint explicitly pleads that TPPs repeatedly paid artificially inflated prices for rotavirus vaccines by covering the healthcare costs of their members. *Id.* ¶ 150. Plaintiff could have offered additional context, such as more detail about the mechanism by which Baltimore and other members of the putative class reimburse or pay for the healthcare costs of their members.[10] But this is not required to plead their claims, and the facts alleged are sufficient to plead antitrust injury. Even *Ashcroft v. Iqbal*, does not "require detailed factual allegations," but simply "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 556 U.S. 662, 678 (2009).

#### b. Plaintiff alleges that Merck's bundled discounts caused it to pay higher prices for RotaTeq.

*7 Merck further argues that Plaintiff fails to plead sufficient facts to support the inference that it paid inflated prices for RotaTeq beyond "conclusory, threadbare assertions" that healthcare providers paid more for rotavirus vaccines than they would have absent Merck's bundled discounts. Mot. Dismiss 14.

This is an inadequate description of the Complaint. Plaintiff specifically alleges that the loyalty provision in purchasing agreements enhances Merck's monopoly power and allows Merck to maintain anticompetitive monopolist prices on RotaTeq, as well as prevent any price competition in the rotavirus market more broadly. *Id.* ¶¶ 147, 154-59. To support this assertion, the Complaint sets forth the private list price for RotaTeq since its introduction in 2006. *Id.* ¶ 161. Plaintiff highlights the fact that the price of RotaTeq has either increased or remained the same every year since its introduction, despite facing new competition from Rotarix starting in 2008. *Id.* ¶¶ 160-61. Taken together, these allegations plausibly suggest that prices that Plaintiff and others in the putative class paid for RotaTeq were higher than they would have been absent Merck's anticompetitive conduct.

Merck attempts to discount the import of these list prices, emphasizing that those purchasing the entire Merck bundle actually paid much lower prices for RotaTeq and other vaccines. Mot. Dismiss 5-6; *see also* Compl. ¶ 122 (discussing loyalty discounts compared to list price). But this does not squarely address Plaintiff's central allegation that Merck's actions inflated *all* prices for RotaTeq and other vaccines, whether a purchaser received the loyalty discount or not. As Plaintiff persuasively argues in the Complaint and in its opposition to this motion:

> A simple example illustrates how bundled "discounts" cause inflated prices. If Merck's bundled price for Loyal Buyers of RotaTeq is $60 per dose, and the list price for Disloyal Buyers who refuse the bundle is $70 per dose, Merck would claim that Loyal Buyers receive a $10 bundled "discount." But ... if the Bundle had not insulated Merck from competition, Merck would have had to reduce its price dramatically—for example, to $40 per dose. In that case, both the bundled "discount" price and the disloyal penalty price are inflated, because both $60 and $70 obviously are substantially higher than the $40 price that would have prevailed had the Bundle not stymied competition.

Pl.'s Resp. 12; *see also* Compl. ¶ 157. Thus, even though Merck was lowering prices for those loyal to its pediatric vaccine bundle, Plaintiff pleads that the "discount" that loyal purchasers received was still higher than what those groups would have paid with more competition in the rotavirus vaccine market. After discovery, Merck may be able to dispute this allegation. But at this juncture, I must take well-pleaded allegations as true, and Plaintiff has plausibly pled that Merck's conduct artificially inflated vaccine prices for *all* purchasers. [11]

**B. Plaintiff alleges substantial foreclosure of the relevant product market.**

**\*8** Merck also argues that Plaintiff has failed to put forth sufficient factual allegations to show that Merck's conduct has resulted in substantial foreclosure in the rotavirus vaccine market. *See, e.g.*, *LePage's*, 324 F.3d at 157-58 (discussing that arrangements that substantially foreclose access to relevant markets by competitors are likely violations of antitrust law). In support of this argument, Merck claims that: (1) Plaintiff puts forth no substantive allegations to support the conclusory statement that the Merck bundle "forecloses competition in greater than 40%", Compl. ¶ 5, of the market; (2) Plaintiff has failed to sufficiently define the relevant product market, as the Complaint does not clarify the share of Plaintiff's alleged product market comprised of private versus public sector sales, nor the share of private sector sales governed by purchasing group contracts; and (3) Plaintiff's low foreclosure percentage of 40%, without more facts as to anticompetitive effects, is insufficient to support federal antitrust claims. Mot. Dismiss 15-18.

Turning to the first point, I find that Plaintiff has presented more than just a "conclusory" allegation that the Merck bundle foreclosed at least 40% of the market. As discussed above, Plaintiff sets forth detailed allegations that Merck imposed anticompetitive bundling contracts on most private purchasers of rotavirus vaccines in the United States, and that these contracts reduced any competitor's ability to compete in the rotavirus vaccine market such that a significant part of that market was foreclosed. *See* Compl. ¶¶ 142-49. Indeed, the section of the Complaint discussing foreclosure spans eight lengthy paragraphs encompassing three pages, *see id.*, and to say that such allegations are "conclusory" is something of a stretch. *See Fowler*, 578 F.3d at 211 (holding that surviving a motion to dismiss requires a plaintiff to set forth enough factual allegations to show that the plaintiff has a "plausible claim for relief"). Merck offers little beyond the general principles of pleading discussed in *Iqbal.* So long as an antitrust complaint sets forth enough factual allegations to make the foreclosure percentage plausible, dismissal on such a basis is inappropriate prior to discovery.

As to market definition, the Third Circuit has recognized that, absent some obvious oversight in the pleadings, "courts are cautious before dismissing for failure to define a relevant market." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). Here, the Complaint explicitly identifies the critical market as the sale of rotavirus vaccines in the United States and describes several additional vaccine markets in the United States that may be relevant to Plaintiff's claims. *See* Compl. ¶ 40; *see generally id.* ¶¶ 39-106. The Complaint also explains that these products are not interchangeable, nor do they have reasonable substitutes. *Id.* This is enough to plead the contours of the relevant market at the pleadings stage. [12]

**\*9** As to Merck's third point related to the percentage of market foreclosure alleged, I find that Plaintiff's allegation of

40% foreclosure is more than sufficient to support its antitrust claims. "There is no fixed percentage at which foreclosure becomes 'substantial' and courts have varied widely in the degree of foreclosure they consider unlawful." *Eisai,* 821 F.3d at 403 (citation omitted); *see also McWane, Inc. v. F.T.C.,* 783 F.3d 814, 837 (11th Cir. 2015) (stating that "a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases" but recognizing that "some courts have found that a lesser degree of foreclosure is required when the defendant is a monopolist"); *United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001) (acknowledging that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation"). Moreover, courts have deemed several additional factors relevant to the foreclosure inquiry, such as the ability of purchasers to switch between products, the exclusion of equally efficient competitors, and the ability to reach customers. *See Eisai,* 821 F.3d at 403-04, 406 (suggesting that courts analyzing foreclosure and assessing harm to competition should examine the ability to switch between products, the exclusion of equally efficient competitors, and the ability to reach customers). Here, Plaintiff puts forth specific allegations regarding limitations upon medical providers' ability to switch vaccines, Compl. ¶ 146, as well as broader allegations regarding Merck's exclusion of an equally efficient competitor, GSK, as discussed above. At the dismissal stage, this suffices as a plausible showing of foreclosure.

### C. Plaintiff has pleaded an ongoing antitrust violation that may justify equitable relief on its federal claims.

Merck's final argument regarding the federal antitrust claims asserts that Plaintiff's request for injunctive relief must be dismissed because Plaintiff does not plead that it lacks an adequate remedy at law – and necessarily would have no basis to do so, as Plaintiff seeks money damages under each of its state law claims. Mot. Dismiss 18.

Merck is correct that a party is entitled to equitable relief only if it lacks an adequate remedy at law. *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974); *see also eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006) (finding that equitable principles require a showing of (1) "irreparable injury", (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury", (3) a "balance of hardships between plaintiff and defendant" justify a remedy in equity, and (4) "public interest would not be disserved"). But damages are not always sufficient to completely remedy an ongoing harm with a risk of future injury. *See Sanchez v. Sams W., Inc.,* No. 21-05122, 2022 WL 2035961, at *3 (C.D. Cal. Mar. 8, 2022) ("legal damages are typically inadequate to remedy the future harms from ongoing violations"); *Lee-Bolton v. Koppers Inc.,* No. 10-253, 2012 WL 12817318, at *1 (N.D. Fla. Feb. 10, 2012) ("since the alleged harm is ongoing and continuing to cause contamination, Plaintiffs have adequately alleged sufficient facts to indicate that they are without an adequate remedy at law"); *cf. Dearth v. Holder,* 641 F.3d 499, 501 (D.C. Cir. 2011) (holding that in cases seeking declaratory and injunctive relief, a plaintiff must show that it is "suffering an ongoing injury or faces an immediate threat of injury" to have standing to seek relief). Here, Plaintiff explicitly alleges that Merck's anticompetitive efforts are "continuing to the present day," as Merck continues to enter new contracts with the bundled discount provision, and further alleges that Plaintiff and members of the putative class will likely face future injury because of Merck's ongoing conduct. Compl. ¶¶ 162-65, 189, 197-98. At the pleading stage, this is sufficient to show that, even if Plaintiff and the putative class are awarded damages for Merck's *past* anticompetitive conduct, these damages may be insufficient to adequately remedy ongoing harm.

Plaintiff further cites case law discussing standing for seeking injunctive relief under Section 16 of the Clayton Act because Plaintiff's claims, while ostensibly brought under the Sherman Act, are also brought "within the meaning of Section 16 of the Clayton Antitrust Act" due to Merck's continuing violations of the antitrust laws. Compl. ¶¶ 192, 204. [13] Section 16 "filled a gap in the Sherman Act by authorizing equitable relief in private actions," *California v. Am. Stores Co.,* 495 U.S. 271, 287 (1990), and the Supreme Court has stated that the statute "should be construed and applied" with its purpose of enforcing the antitrust laws in mind. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 395 U.S. 100, 131 (1969). To have standing to pursue injunctive relief under Section 16, a plaintiff must demonstrate that the injury in question is "injury of the type the antitrust laws were intended to prevent." *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399 (3d Cir. 2000) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). A plaintiff seeking relief

pursuant to Section 16 must also demonstrate its "entitlement to injunctive relief" by alleging a threatened loss or injury that will result from the alleged antitrust violation. *Id.* at 400. Here, Plaintiff sets forth ample allegations, as discussed in the preceding paragraph, demonstrating a threatened injury from Merck's ongoing anticompetitive conduct, as Plaintiff and others allegedly may pay inflated prices for rotavirus vaccines so long as Merck's conduct continues. *See* Compl. ¶¶ 162-165, 189, 197-98. This is likely sufficient to satisfy standing under Section 16. *In re Suboxone*, 64 F. Supp. 3d at 711 (finding that end payors could seek injunctive relief for ongoing inflated prices).

**\*10** Merck rightly points out that standing under Section 16 is a different inquiry from assessing the general requirements for seeking equitable relief in federal court. *See Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 345 F. Supp. 3d 614, 651–53 (E.D. Va. 2018) (discussing Section 16 standing separately from equitable requirements), *vacated on other grounds*, 988 F.3d 690 (4th Cir. 2021). But I am nonetheless persuaded that the Section 16 standing analysis lends support to the notion that equitable relief may ultimately be justified if Plaintiff prevails on its federal claims, given the central role of the statute when private plaintiffs seek injunctive relief to enforce the antitrust statutes. And as a practical matter, it is unclear why Plaintiff's demand for a remedy requires resolution at the outset of the case.

I therefore find that Plaintiff has put forth sufficient allegations to justify its request for injunctive relief.

**D. Plaintiff has standing to pursue its state law claims.** As to the state law claims asserted in the Complaint, Merck advances two broad arguments that relate to all of Plaintiff's antitrust and consumer protection claims under state law: standing, and a failure to adequately plead the elements of each claim. Mot. Dismiss 19-21.

Merck first argues that Baltimore lacks standing to assert claims in jurisdictions where it does not reside, or where it does not reimburse or pay for rotavirus vaccines. Mot. Dismiss at 21; *see also* Compl. ¶ 8 (stating that Baltimore purchased, paid and/or provided reimbursement for use of the rotavirus vaccines in Arizona, California, Connecticut, D.C., Iowa, Idaho, Massachusetts, Maryland, Missouri, North Carolina, and New York). But a motion to dismiss is not the proper time to raise such arguments where a plaintiff is bringing an array of similar claims on behalf of a nationwide class. *See Suber v. Liberty Mut. Ins. Grp.*, 2022 WL 952889, at \*6 (E.D. Pa. Mar. 30, 2022) (McHugh, J.) (collecting cases). Much like the defendant in *Suber*, Merck seems to suggest a *per se* rule requiring a court to dismiss state law causes of action for lack of standing prior to class certification. But, again, I view the Third Circuit's decision in *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) as having rejected the existence of such a *per se* rule, particularly when read in tandem with other Circuits' rulings. *See Suber*, 2022 WL 952889 at \*6; *see also In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 829 (E.D. Pa. 2019) (Rufe, J.) (rejecting an attempt to apply such a *per se* rule and examining many of the same cases Merck raises here). Indeed, as the Second Circuit has recognized, it is an "obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate." *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 95 (2d Cir. 2018).[14] To dismiss claims on standing grounds prior to understanding the breadth (or limits) of the class would therefore be premature.

**\*11** Dismissal of state law claims prior to the class certification inquiry and class discovery is particularly inappropriate where "success on the claim under one state's law will more or less dictate success under another state's law." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018). Here, the state antitrust laws cited by Plaintiff largely track federal antitrust statutes, and state courts interpreting those statutes often look to federal antitrust law to guide their interpretation of these statutes. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2410 (2d ed. 2006); *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-2445, 2017 WL 4642285, at \*11 (E.D. Pa. Oct. 17, 2017) (Goldberg, J.) (noting that "state antitrust laws ... continue to be consistently interpreted in parallel, if not identically, with the Sherman Act"). Accordingly, Plaintiff presents a compelling argument that its antitrust claims will generally mirror the antitrust claims of unnamed class members. Similarly, because the consumer protection claims are rooted in the same anticompetitive conduct as the antitrust claims, these claims are also likely to rise and fall together. At class certification, Merck will have ample opportunity to contest the adequacy of named Plaintiffs to represent the class, the typicality of their claims, and the predominance of common questions of law or fact, and can

again advance many of these arguments. See *Neale*, 794 F.3d at 368 (stating that "Volvo's arguments related to the differences between claims among the separate statewide classes" should not be "shoehorn[ed]" into an Article III analysis, as they bear more directly on the Rule 23 analysis). For now, Plaintiff has sufficiently pleaded standing such that the array of state law claims asserted on behalf of the class survive dismissal.

**E. Sufficiency of the Pleading of the State Law Claims**

Next, Merck broadly argues that Plaintiff's complaint fails to state a claim under any of the state antitrust and consumer protection laws identified, as the complaint allegedly presents no "particularized allegations about how the conduct at issue violates each of the differing requirements" of these statutes and fails to "explain how Plaintiff's allegations satisfy any of the elements of those statutes," many of which allegedly have "specific, individualized requirements". Mot. Dismiss at 24-25.

But Plaintiff's state antitrust claims are based on the same anticompetitive conduct that is extensively pled earlier in the Complaint. Plaintiff also sets forth seventeen paragraphs over several pages explaining why Merck's anticompetitive conduct violates state antitrust law in addition to the Sherman Act. *See* Compl. ¶¶ 208-22. Moreover, as already noted, state antitrust laws are generally interpreted "in parallel, if not identically" to the federal antitrust law. *In re Suboxone*, 2017 WL 4642285, at *11; *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 572-73 (S.D.N.Y. 2021) (citation omitted) (stating that state antitrust laws generally require proof of elements that are identical to "those that must be proved under the Sherman Act with respect to monopolization or restraint-of-trade claims" and that many states "even have statutes requiring that their antitrust laws be construed in harmony with ruling judicial interpretation of federal antitrust law"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 348 (3d Cir. 2011) (Jordan, J., dissenting) (noting that "most states have traditionally followed federal law in interpreting their own state antitrust laws"). Plaintiff's state antitrust claims are therefore sufficiently pled.

As to the wide array of consumer protection claims asserted, Merck's argument also fails. Courts in this Circuit have repeatedly found that, where a class action asserts federal antitrust, state antitrust, and state consumer protection claims all rooted in the same anticompetitive conduct, the complaint's antitrust allegations are generally sufficient to support their consumer protection claims at the dismissal stage. *See, e.g.*, *In re Generic Pharms.*, 368 F. Supp. 3d at 840 (denying a motion to dismiss where Plaintiffs' complaint similarly set forth "detailed factual allegations that make plausible their claims that ... Defendants engaged in unfair competition" because Plaintiffs "need not reiterate these facts in their consumer protection law counts"); *In re Seroquel XR Antitrust Litig.*, No. 20-1076, 2022 WL 2438934, at *21 (D. Del. July 5, 2022) (rejecting "Defendants' suggestion that the End-Payors must list the elements of every asserted state consumer protection statute and connect the pleaded facts to those elements," where Plaintiffs in a class action relied on the same factual allegations to support both state antitrust and consumer protection claims)*;* *In re Domestic Drywall Antitrust Litig.*, No. 13-2437, 2016 WL 3769680, at *11 (E.D. Pa. July 13, 2016) (Baylson, J.) (denying a motion to dismiss where defendants argued that plaintiffs failed to properly plead all elements of their consumer protection claims, but the claims rested on anti-competitive conduct extensively pled elsewhere in the complaint, and declining defendants' "invitation for the Court to comb through all of Plaintiffs' consumer protection claims"). Here, Plaintiff identifies the elements of a claim under each consumer statute and concisely connects those elements to its extensive allegations of anti-competitive conduct pled elsewhere. Taken together with Plaintiff's state and federal antitrust claims, this is enough to plausibly allege violations of the consumer protection laws.

**\*12** Merck's blanket argument that Plaintiff fails to state any of the state law claims due to allegedly "threadbare" pleadings is therefore insufficient to justify dismissal. [15]

**F. State-specific antitrust law issues**

In addition to these broad conceptual arguments, Merck raises an array of state-specific arguments based on unique elements in each state antitrust statute or rooted in the way that each state's courts have interpreted their own antitrust statute. Mot. Dismiss 26. For the reasons below, these arguments lack merit, and all of Plaintiff's state antitrust claims survive dismissal.

*1. Mississippi & Tennessee: nexus to jurisdiction*

The first state-specific issue that Merck raises involves the requirement, under Mississippi and Tennessee antitrust laws, that anticompetitive conduct have a significant nexus to the respective state. *See* Miss. Code Ann. § 75-21-3; Tenn. Code Ann. § 47-25-101; Mot. Dismiss 27-28. Merck argues that Plaintiff failed to plead any specific conduct occurring within either state and therefore, these claims should be dismissed.

Satisfying the nexus requirement at the dismissal stage of both statutes, however, is not as demanding as Merck suggests. Courts have regularly found that the nexus requirement is satisfied for purposes of the Mississippi and Tennessee antitrust laws so long as there is some allegation in the complaint that the anticompetitive conduct impacted intrastate commerce. *See In re Suboxone*, 64 F. Supp. 3d at 698 (finding allegations that anticompetitive conduct "occurred in part ... within the states set forth," and had substantial intrastate effects that impacted costs to retailers and end payors in each state, sufficient to state antitrust claim under Mississippi law); *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407-08 (S.D.N.Y. 2011) (finding an allegation that defendants' conduct was "in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States" sufficient to satisfy the nexus element of a Tennessee antitrust claim). Indeed, other courts routinely find that plaintiffs "sufficiently pled state antitrust claims where they alleged a nationwide antitrust violation that increased prices paid by the end payors in each state." *In re Generic Pharms.*, 368 F. Supp. 3d at 837 (citation omitted) (collecting cases and finding that end payor plaintiffs satisfied nexus requirement as to Tennessee antitrust claim).

**\*13** Here, Plaintiff alleges that Merck's anticompetitive conduct – while primarily impacting *inter*state commerce – occurred in part in intrastate commerce within the states identified in the complaint, including Mississippi and Tennessee. Compl. ¶¶ 166-68. Merck allegedly shipped RotaTeq vaccines into each jurisdiction, sold RotaTeq in each jurisdiction, coerced healthcare providers in each jurisdiction into allegedly exclusionary pediatric vaccine contracts, and increased prices paid by patients and TPPs in each jurisdiction. Compl. ¶¶ 167-68, 217. At this stage, this satisfies the nexus requirement.

*2. Illinois: bar on indirect purchaser plaintiffs*

Merck argues that Plaintiff is barred from bringing a class action under the Illinois Antitrust Act, Mot. Dismiss 28, which specifies that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. Comp. Stat. 10/7(2). No federal circuit court has squarely addressed whether this rule bars class actions in federal court, and district courts are divided over the issue. Some courts find that the rule does not bar such actions, both on its terms (finding that the language of the statute only bars class actions by indirect purchases in Illinois courts) and because, as a state procedural rule, it does not apply in federal court. *See, e.g., In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017) (citing *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 397–406 (2010)); *In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, No. 21-12061, 2023 WL 2182046, at *5 (D.N.J. Feb. 23, 2023); *In re Seroquel XR*, 2022 WL 2438934, at *17. But, other courts have found that the rule *does* bar federal class actions, because this rule is "intertwined" with the underlying substantive right and therefore must govern in federal court under *Shady Grove*. *See, e.g., In re Generic Pharms.*, 368 F. Supp. 3d at 834; *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 392 (D.N.J. 2018); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 418 (D.N.J. 2018).

I find the reasoning of the former cases more persuasive, in part because it appears more consistent with the overall principles endorsed by *Shady Grove*. I will therefore allow the claim under the Illinois Antitrust Act to proceed. Preliminarily, I note that *Shady Grove* does not as clearly foreclose class relief in federal court under this Act as Merck and some other courts would suggest. As a federal court in Illinois observed in reviewing Justice Scalia's opinion and Justice Stevens' concurrence in *Shady Grove*, "both the plurality and concurrence were primarily focused on the fact that both Rule 23 and the New York statute governed when a class action was permissible, and this was a procedural, not substantive conflict." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017). Indeed, while Merck relies heavily on Justice Stevens' concurrence, that concurrence does not clearly resolve this issue in Merck's favor. As Justice Stevens explained, even where a rule has

some significant impact on the outcome of the case, it may well still be considered procedural such that a federal rule should displace it:

> [I]n considering whether to certify a class action such as this one, a federal court must inquire whether doing so would abridge, enlarge, or modify [a state's] rights or remedies, and thereby violate the Enabling Act. This inquiry is not always a simple one because it is difficult to conceive of any rule of procedure that cannot have a significant effect on the outcome of a case, and almost any rule can be said to have substantive effects, affecting society's distribution of risks and rewards. Faced with a federal rule that dictates an answer to a traditionally procedural question and that displaces a state rule, one can often argue that the state rule was *really* some part of the State's definition of its rights or remedies.

**\*14** *Shady Grove*, 559 U.S. at 431-32 (Stevens, J., concurring) (internal citations omitted) (emphasis in original).

Here, the provision of the Illinois Antitrust Act at issue certainly has some substantive effect, inasmuch as whether a private plaintiff can bring a class action bears significantly on the damages that a single lawsuit could seek. But at its core, this provision does not appear to be motivated by a desire to close off relief, or dramatically alter private plaintiffs' rights to bring claims under the state antitrust law. *See* 740 Ill. Comp. Stat. 10/7 (permitting any person injured by anticompetitive conduct, including indirect purchasers, to bring an action for damages under the Act); *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 818 (noting that "whether [indirect purchasers] may bring a class action does not affect their substantive rights"). Rule 23 should therefore govern the availability of the class action mechanism where an Illinois Antitrust Act claim is brought in federal court. Moreover, as other courts have discussed, the plain language of the statute itself does not suggest a legislative intent to foreclose all private class actions, but merely those in Illinois state courts. *See In re Seroquel XR*, 2022 WL 2438934, at \*18 (finding that "[n]othing in the quoted text says or implies that the limitation prohibits a plaintiff from asserting Illinois antitrust claims in class actions filed in federal courts").

I will therefore deny Merck's motion as it relates to this claim.

### 3. Utah: citizenship/residency requirement

Merck asserts that Plaintiff cannot bring a claim under the antitrust law of Utah because Plaintiff is neither a Utah citizen nor a Utah resident. Mot. Dismiss 28-29. Under the Utah Antitrust Act, "[a] person who is a citizen of this state or a resident of this state" can bring a claim. Utah Code Ann. § 76-10-3109(1)(a). Many courts, in reviewing this statute, have found that at least one named plaintiff must be a Utah citizen or resident when a class action asserts claims under the Utah Antitrust Act. *See In re Lipitor*, 336 F. Supp. 3d at 419 (collecting cases). But other courts have reached the opposite conclusion, finding that a resident or citizen plaintiff is not required where the class action complaint alleges that members of the class were Utah citizens or residents. *See In re Generic Pharms.*, 368 F. Supp. 3d at 838 (collecting cases).

Plaintiff's complaint alleges that members of "the Utah Class" purchased, paid for, or provided reimbursement for rotavirus vaccines in Utah, Compl. ¶ 388, but does not explicitly state that anyone in the class is a Utah citizen or resident. Nonetheless, because this argument essentially sounds in standing, and in many ways relates to the Article III standing issues discussed previously, I find that class certification will be a more appropriate stage to resolve this issue. *See Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 696 (M.D. Tenn. 2018) (finding that "the issue of whether Plaintiffs have standing to pursue the Utah antitrust claim ... is better decided at the class certification" stage where "Plaintiffs assert allegations on behalf of a putative class that presumably includes Utah citizens and residents"). For now, this claim survives.

### G. State-specific consumer law issues

**\*15** Merck similarly raises several unique issues involving the array of consumer protection claims brought here. Although many of these arguments also fail, based on my

review of the case law I agree with Merck that the claims brought under the Idaho and Utah consumer protection statutes must be dismissed.

*1. California, Florida, New Hampshire, North Carolina: nexus to jurisdiction*

As to Plaintiff's consumer protection claims, Merck first argues that the Complaint fails to allege a sufficient nexus to California, Florida, New Hampshire, and North Carolina, as required to plead a claim under each of these states' consumer laws. Mot. Dismiss 29-30.

Merck is correct that the consumer protection laws of these states likely require some allegation of intrastate conduct to state a claim. See Cal. Bus. & Prof. Code §§ 17200 et seq.; Fla. Stat. § 501.204(1); N.H. Rev. Stat. Ann. § 358-A:2; N.C. Gen. Stat. §§ 75-1.1 et seq.; In re Pork Antitrust Litig., 495 F. Supp. 3d 753, 787-88 (D. Minn. 2020) (noting that the Florida statute "does not contain any language creating a geographic limitation," but recognizing that some Florida courts have applied an intrastate conduct requirement). But like the nexus arguments involving the Mississippi and Tennessee antitrust laws, I do not view Plaintiff's complaint as deficient in this respect. The Complaint alleges that Merck has engaged in intrastate anticompetitive conduct in all these jurisdictions by, among other things, shipping and selling to these jurisdictions, pushing coercive purchasing agreements in these jurisdictions, and forcing class members to pay supra-competitive prices in these jurisdictions. See Compl. ¶¶ 166-68, 239, 258, 332, 352.

Courts in this Circuit and elsewhere have held that allegations of a nationwide anticompetitive scheme that raises prices for pharmaceutical products are sufficient to satisfy the intrastate pleading requirements of the consumer protection laws invoked here, particularly where the plaintiffs alleges that anticompetitive conduct had price impacts in each state. See, e.g., In re Generic Pharms., 368 F. Supp. 3d at 845 (finding that plaintiffs had satisfied intrastate pleading requirements for these states by alleging a broad nationwide scheme to fix generic drug prices); In re Domestic Drywall, 2016 WL 3769680, at *9 (finding allegations of wholly intrastate commerce are not required under North Carolina consumer protection law); Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 409 (E.D. Pa. 2010) (Stengel, J.) (allowing indirect purchasers' claims under the Florida consumer protection law to proceed where the alleged injuries did not take place entirely within Florida); In re Suboxone, 64 F. Supp. 3d at 699 (finding that plaintiffs sufficiently established an intrastate nexus for a consumer protection claim under California law, where plaintiffs alleged that some overcharges for drugs occurred in California).

Plaintiff's allegations of intrastate effects are therefore sufficient to support these consumer protection claims.

*2. California, DC, Hawaii, Missouri, Montana, Rhode Island, Utah, Vermont: end consumer requirement*

Merck also moves to dismiss Plaintiff's claims under the consumer protection statutes of California, the District of Columbia, Hawaii, Missouri, Montana, Rhode Island, Utah, and Vermont, arguing that Plaintiff and members of the putative class do not constitute "consumers" who made purchases for "personal, family, or household use," as is required to pursue a claim under these states' consumer laws. Mot. Dismiss 30-32. There are two separate aspects to this argument – whether a TPP could ever constitute a plaintiff under these statutes, and whether the specific transactions at issue here are covered by these statutes.

*16 As to the first point – whether Plaintiff and other TPPs could constitute "consumers" or "persons" who have standing to sue under these laws – I find that organizations like a TPP may bring suit under each statute:

- California: The relevant statute permits suits by any "person," which includes an array of entities beyond natural persons. Cal. Bus. & Prof. Code §§ 17204, 17201.

- District of Columbia: The D.C. consumer protection act defines a "consumer" as any "person," defined to include entities who purchase "consumer goods or services," so long as the purchase is not "for purposes of resale." D.C. Code § 28-3901(a); see also Adam A. Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005 (D.C. 1989) (stating that a transaction is covered by the statute so long as "the purchaser is not engaged in the regular business of purchasing ... and reselling it").

- Hawaii: Hawaii Rev. Stat § 480-2(e) provides that "[a]ny person may bring an action" under the state's consumer law. In reviewing this statutory language and the legislative history behind it, the Hawaii Supreme Court emphasized that this language must be "construed liberally," and committee reports regarding the statute "suggest that the 'any person' language is to be construed broadly so as to encompass plaintiffs ... who are neither consumers, businesses nor competitors." *Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 309 (Haw. 2010); *see also id.* at 310 n.15 (quoting comments from legislators during floor debates on the bill).

- Missouri: The Missouri Merchandising Practices Act defines a "person" to include entities. Mo. Ann. Stat. § 407.010(5). Courts have found that the statute's "broad language" suggests that parties "besides the direct purchaser or contracting party" may seek damages under the statute. *See Missouri v. Polley*, 2 S.W.3d 887, 892 (Mo. Ct. App. 1999).

- Montana: Montana allows claims by any "consumer," which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." Mont. Code Ann. §§ 30-14-102(1), (6). Other courts have found that the "application of the Montana consumer protection statute is not limited to those who engage directly in consumer transactions." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004).

- Rhode Island: The Rhode Island Deceptive Trade Practices Act ("DTPA") permits claims by "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes," R.I. Gen. Laws § 6-13.1-5.2(a), and defines "person" to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." *Id.* § 6-13.1-1.

- Utah: The Utah Consumer Sales Practices Act ("CSPA") prohibits unconscionable or deceptive acts "in connection with a consumer transaction," and allows a "consumer" to bring suit under the statute. *See* Utah Code Ann. § 13-11-3 *et seq.* Although the statute does not explicitly define "consumer," it defines a consumer transaction to involve a "person," which means "an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative, or any other legal entity. *Id.* §§ 13-11-3(2)(a), (5). The only case that Merck cites in support of the argument that Plaintiff is not a "consumer" under the CSPA is not persuasive, as that case failed to grapple with this statutory language and involved a plaintiff that did not "allege or argue that it [was] a consumer." *See Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, No. 16-00168, 2018 WL 1183372, at *5 (D. Utah Mar. 6, 2018).

**\*17** • Vermont: Unlike many of the other statutes at issue here, the text of the Vermont Consumer Fraud Act ("VCFA") does not as clearly contemplate that entities are covered by the Act. *See* Vt. Stat. Ann. tit. 9, § 2451a (stating that a "consumer" under the statute means "any person" who is involved in specific categories of transactions but failing to define "person" for purposes of the statute). But the Vermont Supreme Court, in reviewing the history of amendments to the VCFA, has noted that the statute was specifically amended "to create a private cause of action for businesses under Vermont's consumer fraud statute," and has held that business entities are "unequivocally ... entitled to the same rights under the Act as other consumers." *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 965 A.2d 460, 467 (Vt. 2008); *see also Ascension Tech. Corp. v. McDonald Invs., Inc.*, 327 F. Supp. 2d 271, 276 (D. Vt. 2003) (finding that the VCFA "countenances a lawsuit brought by a corporation that purchased goods or services for the use or benefit of the business or in connection with the operation of the business, as long as the goods or services were not purchased for resale in the ordinary course of the business").

Other courts have similarly found that TPPs and insurers, like Plaintiff and members of the putative class, can plausibly fall within many of these statutes' definition of "consumer." *See, e.g., In re Generic Pharms.*, 368 F. Supp. 3d at 848 (finding that end payors plausibly alleged that they were "consumers" under consumer protection laws of California, District of Columbia, Hawaii, Massachusetts, Michigan, Missouri, Montana, Nevada, Rhode Island, and Vermont where end payors alleged that they reimbursed or paid for individual consumer transactions and did not engage in resale of the products).[16]

Merck additionally argues that Plaintiff cannot claim to be a "consumer" because it does not purchase vaccines for "personal, family, or household purchases," as required to assert a claim under many of these statutes. *See* Mot. Dismiss 31; *see, e.g.*, Mont. Code Ann. § 30-14-102(1) (authorizing a private cause of action for a "consumer," which the statute defines as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes"); R.I. Gen. Laws § 6-13.1-5.2(a) (allowing suits by "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes"). In response, Plaintiff argues that it is transitively purchasing these vaccines for such uses, as the transactions it reimburses involve purchases by individual consumers for personal use or use by members of their household. *See* Pl.'s Resp. 58-59. While this is a somewhat novel argument that some courts have been hesitant to endorse, it resonates – particularly because so many state courts emphasize that these consumer laws should be construed liberally to be given the broadest remedial effect. *See, e.g.*, *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (R.I. 2014); *Davis*, 228 P.3d at 309; *Elkins v. Microsoft Corp.*, 817 A.2d 9, 13 (Vt. 2002).

Indeed, at least two courts that have considered this argument have agreed that a health plan or insurer who reimburses members for purchases can file suit under a consumer protection law that requires that a plaintiff made the disputed purchases for personal or household use. *See* *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 588 (E.D. Pa. 2018) (Joyner, J.) (finding that an indirect purchaser could sue a pharmaceutical company under the D.C. consumer law where its health-plan members' use of the drug was "personal," involved the "ultimate retail customer," and the purchaser did not resell the drug); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 495 F. Supp. 2d 1027, 1034 (N.D. Cal. 2007) (noting that there was "no serious dispute" that transactions giving rise to claims by TPPs "were primarily for personal purposes, that is, the personal use of the patients," in case involving Michigan consumer law). [17]

**\*18** I therefore find that the claims at issue here arise from "consumer" transactions for purposes of the relevant consumer protection laws.

*3. Idaho, Rhode Island, Utah: anticompetitive conduct not cognizable injury under statute*

Merck additionally moves to dismiss Plaintiff's claims under the consumer laws of Idaho, Rhode Island, and Utah, arguing that anticompetitive conduct is not covered by these consumer protection statutes. [18] Mot. Dismiss 32-33. As to Idaho and Utah, I will dismiss.

a. Idaho

Merck argues that under Idaho Supreme Court precedent, all anticompetitive conduct is not cognizable under the Idaho Consumer Protection Act ("ICPA"), and as such Plaintiff fails to state a claim.

The purpose of the ICPA is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce." Idaho Code § 48-601. The statute identifies nineteen types of conduct that could constitute such conduct, including "[e]ngaging in any unconscionable method, act or practice in the conduct of trade or commerce," which Plaintiff argues covers Merck's anticompetitive conduct here. *See id.* §§ 48-603(18), 48-603C; Compl. ¶¶ 275-278.

In interpreting the statute, the Idaho Supreme Court has held that anticompetitive conduct is not actionable as unconscionable conduct unless it is "directed at the consumer" and "tak[es] advantage of a consumer." *Idaho ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Idaho 2005) (holding that price-fixing claims are not cognizable under the ICPA). *Walden* does not foreclose all claims under the ICPA for anticompetitive conduct, and such conduct may remain cognizable under the statute where the conduct more directly targets consumers and involves sales conduct. *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis*, No. 15-6549, 2018 WL 7197233, at \*41 (S.D.N.Y. Dec. 26, 2018) (denying motion to dismiss an ICPA claim where pharmaceutical manufacturer "marketed and sold [the drug] to consumers at inflated, anticompetitive prices by, among other things, restricting consumer access to generic versions" of the medication, and marketed the withdrawal of the drug to consumers). But where the alleged conduct has only an indirect effect on consumers down the distribution chain, as is the case here, I am persuaded that

such conduct cannot give rise to a claim under ICPA. *See Sheet Metal Workers Loc. 441 Health & Welfare Plan*, 737 F. Supp. 2d at 410 (finding that *Wasden* foreclosed plaintiff's claims where plaintiff failed to allege that defendant "engaged in unconscionable sales conduct directed at consumers").

**\*19** I will therefore dismiss the claim under ICPA with prejudice.

### b. Rhode Island

Merck also claims that the Rhode Island DTPA does not cover antitrust violations, based on the text of the statute. But the statute specifically proscribes "[u]nfair methods of competition," along with "unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6-13.1-2. And many courts have found that allegations of anticompetitive conduct state a cognizable claim under the DTPA. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 762 (E.D. Pa. 2014) (DuBois, J.) (collecting cases and rejecting the argument that the Rhode Island DTPA does not cover price-fixing); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1084-85 (S.D. Cal. 2017) (declining to dismiss the Rhode Island DTPA claim based on the argument that the statute does not recognize claims for price-fixing); *Ames v. Oceanside Welding & Towing Co., Inc.*, 767 A.2d 677, 681 n.6 (R.I. 2001) (holding that that § 6–13.1–3 is to be interpreted "according to the Federal Trade Commission's and federal courts' interpretation of § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)").

The cases Merck cites in support of its argument that such claims are *not* cognizable under the DTPA are not persuasive. One of the cases appears to confuse Rhode Island antitrust law with consumer law and relied on Rhode Island caselaw that discussed antitrust suits by indirect purchasers prior to Rhode Island enacting "repealer" legislation that explicitly permits such suits. *Compare In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) (citing *Siena v. Microsoft Corp.*, 796 A.2d 461, 464-65 (R.I. 2002)) *with* R.I. Gen. Laws Ann. § 6-36-7 (2013) ("In any action under this chapter, the fact that a person or public body has not dealt directly with the defendant shall not bar or otherwise limit recovery."). And in the other case Merck cites, *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d 1072, 1116 (N.D. Cal. 2007), the court came to the opposite conclusion on a later motion to dismiss, after the plaintiffs brought the Rhode Island Supreme Court's decision in *Ames* to that court's attention. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008).

I therefore decline to dismiss Plaintiff's DTPA claim on this basis.

### c. Utah

Merck asserts that the Utah CSPA also does not cover antitrust violations, pointing out that the statute enumerates the specific conduct prohibited by the law, and this list does not include antitrust violations. *See* Utah Code. Ann. §§ 13-11-4, -5 (enumerating specific conduct prohibited under the statute, which does not include antitrust violations). Plaintiffs do not dispute this, but nonetheless argue that Merck's conduct violates the Utah statute as an unconscionable sales practice. *See id.* § 13-11-2 (stating that the CSPA "shall be construed liberally" to, among other purposes, "protect consumers from suppliers who commit deceptive and unconscionable sales practices"); *id.* § 13-11-5 (describing unconscionable acts by a supplier). Courts discussing whether a practice is unconscionable under the CSPA, however, limit such a claim to circumstances where there was "gross bargaining power inequality" or "oppressive contractual terms." *See In re New Motor Vehicles*, 350 F. Supp. 2d at 204-05 (collecting cases discussing unconscionability under the Utah statute). Plaintiff does not plead that either was present in the contracts between Merck and purchasers here, and I will therefore dismiss this claim.

### 4. Florida: pleading with particularity

**\*20** Merck finally argues that Plaintiff has failed to properly plead a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), asserting that all claims arising under the FDUTPA must be pled with particularity consistent with the heightened pleading standard requirements of Federal Rule of Civil Procedure 9(b). Mot. Dismiss 33-34.

Courts are split on whether FDUTPA claims must be pled with particularity where the claim does not sound in fraud. *Compare In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 900 n.33 (E.D. Pa. 2012) (Pratter, J.) (declining to apply Rule 9(b) where plaintiffs' FDUTPA claim did not sound in fraud) *with In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) (applying Rule 9(b) to antitrust plaintiffs bringing a FDUTPA claim); *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 819 (noting that courts are split on the issue, but ultimately declining to apply 9(b) to the FDUTPA claim in that case). Based on my review of the caselaw, I agree with other courts finding that "[t]he trend has been for courts to apply the Rule 9(b) standard when FDUTPA claims sound in fraud." *Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*, No. 20-604, 2020 WL 5350303, at *3 (M.D. Fla. Sept. 4, 2020) (collecting recent cases from Florida courts).

Here, Plaintiff alleges that Merck's bundling practices and discounts constitute anticompetitive conduct but does not allege that Merck engaged in fraud. I therefore find that Plaintiff's claim under the Florida consumer law does not implicate Rule 9(b) and I will not dismiss its FDUTPA claim on this basis. *See In re Processed Egg Prods.*, 851 F. Supp. 2d at 900 n.33 (finding that "Plaintiffs' factual allegations that give rise to their antitrust and consumer protection claims under Florida law do not sound in fraud so as to require the application of Rule 9 under Third Circuit case law").

### IV. Conclusion

For the reasons set forth above, Defendant's Motion will be granted in part and denied in part. An appropriate order follows.

**All Citations**

Slip Copy, 2023 WL 8018980

---

### Footnotes

1 GSK sold a competing HPV vaccine, Cervarix, from 2009 until 2016. Compl. ¶ 71. Even when Cervarix was sold, however, Merck maintained a dominant share of the HPV vaccine market, and just before Cervarix was withdrawn from the market, Merck held a 99.7% share of the HPV vaccine market. *Id.*

2 A "*" indicates a combination vaccine, meaning vaccines are combined into a single product.

3 PRIORIX was approved by the FDA in June 2022. Compl. ¶ 38.

4 Twinrix is a combination hepatitis A and hepatitis B vaccine that can only be used for adults so is not functionally interchangeable with pediatric hepatitis A or B vaccines. Compl. ¶¶ 38, 79, 87.

5 In 2008, RotaTeq's private sector list price per dose was $69.59, and remained the same until 2012, when the price began to increase annually or every other year. Compl. ¶ 161. In 2022, RotaTeq's private sector list price was $93.19 per dose. *Id.*

6 Sections 1 and 2 of the Sherman Act both involve an anticompetitive conduct element. Under Section 1, a plaintiff must establish that the defendant was a party to a contract, combination or conspiracy that "imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010); 15 U.S.C. § 1. Whereas under Section 2, a plaintiff must demonstrate that the defendant willfully acquired or maintained its monopoly power in the relevant market, often by showing that it "compet[ed] on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc) (citing

|   |   |
|---|---|
|   | *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)); 15 U.S.C. § 2. Though slightly different, courts generally conduct the same analysis for anticompetitive conduct for both provisions. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 & n.11 (3d Cir. 2016) (noting that the "applicable law is the same" across claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act). |
| 7 | In reaching this holding, the Circuit also affirmatively cited commentary on the anticompetitive effect of package discounting which emphasized that "even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce." *LePage's*, 324 F.3d at 155 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 794, at 83-84 (Supp. 2002)). |
| 8 | It bears mention that both *Eisai* and *Meritor* were decided on fully developed records, *Eisai* on summary judgment and *Meritor* following a full trial. This underscores an important characteristic of antitrust law. Although the causes of action are defined by statutes, those statutes are cast in broad conceptual terms similar to the common law of negligence. Whether conduct is anti-competitive is heavily fact dependent, and so long as the allegations of an antitrust complaint are plausible, discovery is warranted to evaluate the effects in the marketplace. |
| 9 | Plaintiff also argues that the Complaint alleges harm to competition by reducing GSK's *incentive* to compete. Because I find that Plaintiff has sufficiently alleged that Merck's actions impacted GSK's *ability* to compete, however, I do not need to reach that separate (though related) argument. |
| 10 | Plaintiff's opposition brief attempts to provide further details, but parties may not amend their complaint through briefing. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). |
| 11 | Merck also argues that Plaintiff's allegations as to higher prices are based on allegedly "unsupported" economic theories of a law professor, Einer Elhauge. *See* Mot. Dismiss 14; *see also Eisai*, 821 F.3d at 405-06 (referring to Professor Elhauge's theories regarding the market impacts of "bundling of different types of demand for the same product" as "novel"). I do not read *Eisai* as a definitive rejection of Professor Elhauge's theories, but rather as a case where evidence of anti-competitive effect was lacking. Regardless, assuming that Plaintiff will rely on Professor Elhauge in advancing their case, a motion to dismiss is not the time to assess the validity of his analysis. *Cf. Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 830 (D.N.J. 2015) (finding expert report by Professor Elhauge reliable and his opinions admissible after a *Daubert* hearing). |
| 12 | In its Motion, Merck highlights parts of the Complaint seeming to suggest that private and public vaccine sales in the United States may constitute separate markets, such that Plaintiff's attempt to define the relevant market here as *all* rotavirus vaccine sales in the United States is inappropriate. Mot. Dismiss 3-4. Ultimately, the record may favor defining the market more narrowly to encompass only private rotavirus vaccine sales, but this is the type of specific market definition issue that is better suited to resolution after discovery. *See Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992)) (emphasizing that "[m]arket definition is a highly fact-based analysis that generally requires discovery"). |
| 13 | While I am not sure that Plaintiff is attempting to bring its claims under Section 16, I caution that these paragraphs of the Complaint are likely insufficient to do so, as many other cases involving the statute – including several cited by Plaintiff – involve plaintiffs who filed a standalone claim for injunctive relief that |

| | |
|---|---|
| | more explicitly identified the claim as pursuant to Section 16. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 677 (E.D. Pa. 2014) (Goldberg, J.). |
| 14 | Merck argues that the Third Circuit's opinion in *Neale* directly contradicts the Second Circuit's view in *Langan* and the First Circuit's view in *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018). I do not read *Neale* as conflicting with these cases. Instead, I read all these opinions as recognizing that to establish jurisdiction the named plaintiff must meet Article III's central requirement to show some cognizable "case or controversy" at the dismissal stage, but the more specific inquiry into standing for related claims should wait until after discovery, when a court will "have before it specific facts bearing on the class and the relevant claims." *See* *Neale*, 794 F.3d at 367; *see also* *In re Asacol*, 907 F.3d at 47-49; *Langan*, 897 F.3d at 92-93. |
| 15 | Certainly, the consumer protection statutes – by virtue of requiring slightly different elements to plead a claim – differ in ways that the state antitrust statutes do not. And where Merck has raised specific issues with Plaintiff's ability to pursue a claim under each of these statutes, I address these claims below. But the broad argument that Plaintiff's pleading is insufficient is inadequate to justify dismissal of these claims at this stage. *See* *In re Seroquel XR*, 2022 WL 2438934, at *21 (rejecting similar broad argument that state consumer law claims were pleaded inadequately but addressing specific deficiencies that were raised by the defendants); *see also* *In re Bayer Corp. Combination Aspirin Prod. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010) (finding that plaintiffs' pleadings of state consumer law claims were adequate even where plaintiffs had "outlined only the broad contours of the state law causes of action" because plaintiff had "drawn the connection between the statutes and defendant's offending conduct" that had been pled elsewhere). |
| 16 | Merck's reply brief suggests that *In re Generic Pharmaceuticals* is inapplicable here because the putative class included *both* individual consumers and TPPs. *See* Def.'s Reply at 49 n.28 (ECF 28) (discussing *In re Generic Pharms.*, 368 F. Supp. 3d at 847). But in that case, Judge Rufe's thorough review of the consumer protection laws at issue focused primarily on whether those laws could apply to entities *beyond* the individual consumer who engaged in the disputed transactions. *See* 368 F. Supp. 3d at 847 n.156. As such, while that case is distinguishable in some ways, the reasoning of that opinion is nonetheless relevant and persuasive. |
| 17 | Although *In re Bextra* dealt with the Michigan consumer protection law, which is not involved here, I reject Merck's view that the case is "irrelevant" to the analysis of this issue given that the Michigan statute similarly only reaches the provision of goods and services "primarily for personal, family, or household purposes." *See* Mich. Comp. Laws § 445.902(g). |
| 18 | Merck initially also moved to dismiss the claim brought under the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0903 *et seq.* ("NDTPA"), on the same basis, in part due to some confusion over which section of the statute Plaintiff brings its claim under. But after Plaintiff clarified in its opposition that the NDTPA claim here is brought solely under Nev. Rev. Stat. § 598.0923 – Merck "agree[d] that this argument does not apply to Plaintiff's Nevada consumer protection law claim." Def.'s Reply 40 n.30 (ECF 29-1). *See also* *In re Suboxone*, 64 F. Supp. 3d at 702 (finding that monopolization claims are actionable under Nevada's consumer protection law). |

**End of Document**      © 2023 Thomson Reuters. No claim to original U.S. Government Works.